# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 04 C 3055 |
| CONTINENTAL AIRLINES, INC., | ) ) | |
| Defendants. | ) ) ) | |

## MEMORANDUM ORDER AND OPINION

MARVIN E. ASPEN, District Judge:

Presently before this Court is defendant Continental Airlines, Inc.'s ("Continental") motion for summary judgment of plaintiff United States Equal Employment Opportunity Commission's ("EEOC") employment discrimination and harassment lawsuit on behalf of Alaini Mustafaa. For the reasons set forth below, we grant in part and deny in part the motion for summary judgment.

## I.    SUMMARY OF THE FACTS[1]

---

[1] The EEOC brought this claim as a result of Mustafaa's complaints of unlawful discrimination and harassment on the basis of sex and race. We refer to the plaintiff as "Mustafaa" since she is the charging party.

We find it necessary to comment on both parties' failure to comply with Local Rule 56.1 ("Rule 56.1"). Rule 56.1 requires parties to include material facts, supported by admissible evidence, in their Statements of Facts. *See Malec v. Sanford*, 191 F.R.D. 581, 583-85 (N.D. Ill. 2000). The *Malec* court outlined the procedure for complying with Rule 56.1 in painstaking detail. *Id.* Nevertheless, plaintiff repeatedly cited extraneous, irrelevant information and failed to provide admissible evidence for a number of assertions. (Pl. Facts ¶¶ 40, 91, 97, 41). Also, both parties made denials supported by evidence that did not show a dispute with the preceding statement. (Pl. Resp. ¶¶ 10, 11, 25, 55, 57, 65, 99; Def. Resp. ¶¶ 10, 11, 26, 35, 42, 46, 62, 67); *see Malec,* 191 F.R.D. at 584 ("If the cited material does not clearly create a genuine dispute over the movant's allegedly undisputed fact, the nonmovant should provide an explanation."). Further, both parties cited to evidence which did not support their assertions. (Def. Facts ¶¶ 26; Def. Resp. ¶¶ 10, 11; Pl. Facts ¶¶ 53, 55, 60, 83, 100).

Additionally, Continental, which frequently relied upon *Malec* to chastise plaintiff's noncompliance, failed to follow *Malec's* teachings when, rather than submitting a narrative of facts, it merely directed us to its 56.1 statement. (Mot. Summ. J. at 1; *see, e.g.,* Def. Resp. ¶ 1.)

For purposes of this motion, we view the facts in the light most favorable to Mustafaa, the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S. Ct. 2505 (1986). Alaini Mustafaa, an African-American woman, began working at Continental as a Customer Service Agent ("CSA") in 1995. (Def. Facts ¶ 3, 4.) "CSAs load and unload luggage, freight and mail on and off airplanes." (Pl. Facts ¶ 7.) On September 16, 2000, Continental promoted her to a Lead, a non-management position in which the employee assists his or her supervisor in directing CSAs' work. (Def. Facts ¶ 20.) Mustafaa was the only female Lead ever employed at Continental's Chicago O'Hare station; she was also one of only a few female CSAs. (Pl. Facts ¶ 2.) While Mustafaa was a Lead, the chain of command went as follows: Mustafaa reported directly to supervisors Romualdo Derain and Angel Castillo, who reported to manager Ron Kobylski; Kobylski then reported to Jim Hanselmann, Continental's general manager at Chicago O'Hare. (Def. Facts ¶ 23.)

### 1. Demotion

As a consequence of the airline industry's economic crisis, Continental elected to reduce its work force in September 2001, including three Lead positions at Chicago O'Hare. (Def. Facts ¶ 48, 50-51.) Kobylski decided to demote Mustafaa and Jose Santiago, a Hispanic male, after consulting

---

*Malec* counsels that "[Rule] 56.1 statements do not abrogate a party's obligation to recite its version of the facts in its supporting memorandum; it is inappropriate in one's memo to simply refer the Court to the 56.1 statement." 191 F.R.D. at 585. Aside from inconveniencing us, Continental's attempt to skirt the rule effectively afforded it more space to argue, which could have disadvantaged plaintiff. *See Hicks v. Sheahan,* No. 03 C 0327, 2004 WL 3119016, at *1 (N.D. Ill. Dec. 20, 2004). However, plaintiff neglected to object to this impropriety, and we also granted plaintiff's motion for leave to file their response brief in excess of the fifteen page limit, so we do not find that Continental's violation of Rule 56.1 warrants denial of its motion. We have broad discretion to mandate strict compliance with Rule 56.1, but, since both parties made errors, we "will simply admonish [them] to please conform their pleadings to the rule in the future, and [we] will do [our] best to work with what [we have] been given." *Id.* at *1; *see, e.g., Koszola v. Bd. of Ed. of City of Chicago,* 385 F.3d 1104, 1109 (7th Cir. 2004); *Curran v. Kwon,* 153 F.3d 481, 486 (7th Cir. 1998) (citation omitted). Consequently, we will simply disregard any inappropriate statements, i.e. all non-material facts or material facts that are not supported by admissible evidence. *See Malec,* 191 F.R.D. at 584. Also, we will hereinafter refer to plaintiff as "Mustafaa" since she is the charging party in the EEOC's action.

ramp supervisors regarding their performances.[2] (*Id.* at ¶¶ 52, 53, 55, 71.) Continental contends that performance is the primary consideration for the reduction in Leads. (*Id.* at ¶ 54; Hanselmann Dep. at 72). However, Continental's July 2001 written reduction in work force policy in the *Fly to Win Handbook for Agents* lists seniority as the sole factor for consideration.[3] (Pl. Resp. ¶ 54.) At the time she was demoted, Mustafaa was more senior than other Leads who remained in place. (*Id.*; Pl. Facts ¶ 101.). Subsequent to Mustafaa's demotion, Continental eliminated another Lead position in the international department. Hector Munguia worked as a Lead in that division until his demotion in October 2001. (Def. Resp. ¶ 112.) Continental demoted Munguia, the employee with the least seniority, after determining that none of the Leads in the international department had performance problems. (*Id.*)

In response to Kobylski's inquiry about Leads' performances, five supervisors commented on Mustafaa. One of the five participants, Glenn Bergner, never personally supervised or observed her work. (Pl. Resp. ¶ 55.) Rick Bray did not supervise Mustafaa, but he complained about her lack of organizational skills, observing that "she seemed frazzled." (*Id.* at ¶ 59; Def. Resp. ¶ 117.) Bray also mentioned concerns with Lead Santiago, who caused damage to an aircraft. (Def. Facts ¶ 63.) Additionally, Bray commented on punctuality: Mustafaa called in late two to three times due to car trouble and Lead Janzin Dixon also had attendance problems. (Pl. Resp. ¶ 59; Pl. Facts ¶ 108.) Bray's final contribution involved concerns about Mustafaa's "horseplay" in the break room. (*Id.*)

Matt Gorny, one of the five supervisors to respond to Kobylski, only viewed Mustafaa's work at the beginning of her shifts when Leads did not have many responsibilities. (*Id.*) Nonetheless, Gorny told Kobylski that he had observed Mustafaa in the break room rather than performing duties for incoming flights. (Def. Facts ¶ 64.) Gorny also complained about Santiago's

---

[2] Lead Pat Moore, a white male, voluntarily assumed the role of CSA, abdicating his Lead position. (Pl. Facts ¶ 113.)

[3] On its face, the criteria listed in the *Fly to Win Handbook for Agents* applies to employment decisions irrespective of job titles or classifications like "bid" positions. (Pl. Opp. to Mot. for Summ. J. Ex. G (*Fly to Win Handbook for Agents*) at 1.)

performance, and he concurred with Bray's assessment of Mustafaa's punctuality. (*Id.*)

Derain's contribution consisted of choosing whether to demote Mustafaa or Miguel Reyes. (Pl. Resp. ¶ 55.) Derain selected Mustafaa, despite her seniority and Reyes' prior safety violation, because he "was a stronger [L]ead ... [even though h]e was just pretty much the same as [Mustafaa.]" (*Id.*; Derain Dep. at 96-97.) In January 2001, Continental formally disciplined Reyes for negligently failing to follow safety procedures, which resulted in damage to an airplane, injury to a co-worker, and cancelled flights. (Pl. Resp. ¶ 71.) In contrast, during the time Derain supervised Mustafaa as a Lead, he could not recall any complaints from CSAs about her performance, and he prepared positive write-ups for her file. (Pl. Facts ¶¶ 12, 14-18.) Also, in May 2001, Derain drafted a memorandum to Kobylski stating that "Mustafaa worked well [as a Lead] and is very knowledgeable of the ramp operation ... The problem isn't with the way she handles the operation, it's all the secondary issues with individual agents." (*Id.* at 18.)

Castillo provided most of the complaints about Mustafaa during the meeting. He asserted that Mustafaa "demonstrated planning errors and communication problems in 'irregular operation' situations, which occur when flights failed to take off or land as scheduled." (Def. Facts ¶ 56.) While Castillo coached Mustafaa on irregular operations, he never indicated that she was not progressing well prior to September 2001. (Pl. Resp. ¶ 56; Pl. Facts ¶ 19.)

### 2. *Mustafaa's interpersonal skills*

Mustafaa admits to a personal conflict with co-worker Andrea Weisinger, an African-American female, in May and June 2001. (Def. Facts ¶ 29.) Continental managers Derain, Hanselmann and Kobylski discussed the conflict with the women and issued written notices that future incidents at work would result in formal discipline. (*Id.* at ¶ 31.)

Continental did discipline Mustafaa for an incident involving CSA Vinnie Ziegler. (*Id.* at ¶ 32.) Mustafaa claims that Ziegler subjected her to "thirty minutes of gender-based attacks," which included calling her a "bitch," "slut," and "sexually touchy feely," in supervisor Derain's presence. (Pl. Resp. ¶ 32.) Before Derain intervened, Mustafaa made two requests for his assistance, and she

threatened to call the police because she believed that Ziegler was going to hit her. (*Id.* at ¶ 68.) Mustafaa responded to Ziegler's attacks by making a statement over the public address system. (Def. Facts ¶ 34.) Derain heard Mustafaa say, "I'm touchy-feely, but he's gay[,]" but Mustafaa testified that she said, "if it's okay for him to call me a slut, I guess it's okay if I say I think he's gay." (*Id.* at ¶ 33-34.) Management issued Mustafaa a written warning for her inappropriate statement and disciplined Ziegler for his behavior. (*Id.* at ¶¶ 35, 36.)

Another incident involved CSA Darnell Austin. Castillo claims that he observed Mustafaa yell at Austin, but she explained that she sternly reminded him of her authority as a Lead after enduring gender-based derogatory comments from her subordinate. (*Id.* at ¶ 58; Pl. Facts ¶ 27.)

### 3. *Management's lack of support*

Mustafaa's complaints include claims that management failed to support her as a Lead and failed to adequately respond to discriminatory and harassing behavior in the workplace. At a meeting on May 21, 2000, Hanselmann, Kobylski, Castillo, and Derain discussed Mustafaa's concern that she was not getting support from management. (Def. Facts ¶ 40.) Continental claims that Mustafaa could not provide specific instances of conduct regarding the lack of support and discriminatory conduct; Mustafaa counters that she did in fact supply examples, but the managers dismissed them as having been previously addressed. (*Id.* at ¶ 41, 42; Pl. Resp. ¶ 41, 42.)

Mustafaa also informed her supervisors immediately following certain incidents between her and various CSAs. (Pl. Resp. ¶ 42.) For example, she told Castillo about CSA Roberto Niz's failure to follow her directions, CSA Austin's insubordination and inappropriate communications, and Lead Doran's comments, such as "[you] need[] to go home to cook for [your] husband." (*Id.*) At first, Castillo responded to Mustafaa's complaints by informing her crew that such discriminatory behavior would not be tolerated. (Def. Facts ¶ 107; Mustafaa Dep. at 206-07.) The situation did not improve and she no longer felt comfortable relying on Castillo so she reported subsequent misconduct to Derain. (Pl. Resp. ¶ 108; Def. Facts ¶ 109.) For example, Mustafaa informed Derain about Ziegler's behavior, which included failing to follow instructions and disrespectful remarks.

(*Id.*) According to Mustafaa, Derain met with Mustafaa's crew and said: "This is your [L]ead agent. You will treat her like a [L]ead agent. And, guys, understand she's a woman. Sometimes she might need a little bit of help." (Def. Facts ¶ 109.) Also, Derain counseled Mustafaa about her concerns that the crew did not listen to her by likening Mustafaa's experience to his own:"[t]hese guys are just – you're new. They're giving you a hard time because they really don't know how you are as ... a [L]ead ... [The same thing happened with me.]" (Derain Dep. at 44.)

Additionally, Derain prepared a memorandum dated May 20, 2001, wherein he informed Kobylski and Hanselmann that Mustafaa "alleges that [CSAs] don't respect her authority on the ramp because she is a [black] woman." (Pl. Resp. ¶ 47.) Management met with Mustafaa to address her concerns, but there is no evidence that the company further investigated her claims of gender discrimination. (Pl. Facts ¶ 84; Def. Facts ¶ 40.) Rather, Continental responded by issuing "a written directive to all agents [] instructing them to comply with their [L]eads' orders." (Def. Facts ¶ 44.) Additionally, supervisors met with the CSAs to verbally reinforce the directive.[4] (Pl. Resp. ¶ 44.)

### 4. *Discrimination and harassment during work*

Mustafaa testified that CSAs and Lead Doran regularly directed gender-based comments at her during the year that she worked as a Lead, including:[5]

1. "I'm not listening to this slut. I hate her ... I hate this bitch ... Whore."
2. "Man, she a [sic] woman ... This a [sic] man's job."
3. Look at how she doing this job. Man, she need to carry her butt back to the morning shift. She don't know what she doing. These women."
4. "You need to go home and cook for your husband."
5. "That woman doesn't know what she's doing."

---

[4] Mustafaa claims that Castillo informed a number of CSAs that they could bypass Mustafaa and go to him directly if they needed anything. (*Id*. at ¶¶ 44, 92.) There are serious questions as to whether this evidence constitutes inadmissible hearsay. Regardless, Castillo's alleged statements do not impact our ruling so we will disregard the evidence.

[5] Continental repeatedly objects to Mustafaa's "self serving and uncorroborated testimony." However, facts within Mustafaa's personal knowledge, such as co-workers' derogatory statements made in her presence, are properly supported by deposition testimony at this stage of litigation. *See Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) (finding self-serving affidavit proper form of evidence for summary judgment so long as the information contained therein is based on personal knowledge).

6. "Man, you ain't no man. Why you trying to do this job?"
7. "You're a woman trying to do a man's job. Be a man and unload that tire."
8. "Can't no [sic] woman be on no ramp, all this loading and lifting. What she [sic] trying to do? Ain't nobody going to listen. I ain't going to listen to her."
9. "I'm not going to listen to her ass...She a [sic] fucking woman. She don't know [sic] what she talking about."
10. "I'm not going to listen to a woman."
11. "You're trying to be a man, doing a man's job, you can do it yourself."
12. "You're a woman trying to do a man's job."
13. "Be a man and unload that tire."
14. "Look at how she doing this job. Man she need to carry her butt back to the morning shift. She don't know what she doing. These women!"
15. "I'm talking to your ass."

(Pl. Resp. ¶ 75; Pl. Facts ¶¶ 31, 36, 37, 38; Def. Facts ¶ 74-75; Mustafaa Dep. at 125-26, 175 199-201, 203-04, 281-82.)

Mustafaa reported most of the comments to her supervisors, but at some point she refrained from making complaints because she felt that they were not taken seriously. (Pl. Facts ¶ 85; Mustafaa Dep. at 177-78; Derain Dep. at 178.) Mustafaa believed she needed to accept the discriminatory behavior or quit her job. (Pl. Facts ¶ 85; Mustafaa Dep. at 177-78.) Castillo reinforced her perception when he advised Mustafaa to learn to work with Doran despite his discriminatory comments because "that's just how Pat is." (Pl. Facts ¶ 95.) Mustafa also claims that she was subjected to racial slurs. For example, Lead Pat Moore described the crew Mustafaa was working on to include a "nigger" and a "spic." (*Id.* at ¶ 41.) Mustafaa claims that she heard Lead Aberle use the term "nigger."[6] (Mustafaa Dep. at 284, 288-89.)

Further, Mustafaa complained that Doran, Roberto Niz, Scott Savage, and Castillo regularly cursed at her during work. (Pl. Facts ¶ 29.) For example, Doran cursed at her twice a week during her tenure as Lead. (Def. Facts ¶ 76.) Mustafaa admits that she also used profanity, but not in the same context as her co-workers. (Pl. Facts ¶ 21.) For example, Doran would tell Mustafaa to "get [her] ass at home, go sit behind that fucking desk ... [that she was] a fucking idiot [and] ... so damn

___

[6] Mustafaa recounts additional instances where Aberle used derogatory terms outside of her presence. (Pl. Facts ¶ 39-40; Mustafaa Dep. at 284, 288-89.) She also claims that a Hispanic co-worker overheard Castillo make racist comments in Spanish. (Mustafaa Dep. at 328.) However, we cannot consider those inadmissible hearsay statements for summary judgment. *See Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997)

stupid."[7]  (*Id.*)  While Mustafaa reported Doran's conduct to Kobylski on at least five separate occasions, the situation did not improve.  (*Id.*) Also, Mustafaa claims that Castillo often cursed at her and that after she complained about his conduct to Kobylski and Bray she had a lot of problems with him.  (Def. Facts ¶¶ 78, 79; Pl. Resp. ¶¶ 78, 79.)  Mustafaa also witnessed Castillo, Doran, Niz, and Savage use profanity with male and Caucasian employees.  (Def. Facts ¶ 80; Def. Resp. ¶ 29.)

In addition to workplace statements, Mustafaa testified about certain events that created an unpleasant environment.  For example, she recounted an incident where Lead Doran sprayed her in the face with de-icing fluid while they were working on an aircraft.  (Def. Facts ¶ 89.)  At the time of the disturbance, Mustafaa was stationed at the tail of the plane and Doran was located on the opposite side.  (Pl. Resp. ¶ 90.)  Based on their relative positions, Mustafaa claims that Doran needed to specifically aim the de-icer at her, discounting the possibility of an accidental occurrence despite winter weather conditions.  (*Id.*)  After Doran sprayed Mustafaa, she complained to Kobylski who observed the incident.  Kobylski laughed as he responded: "spray his ass back."  (Pl. ¶ 50.)

Mustafaa also described instances where she was sent up to her superior's office "for no reason," especially in the weeks leading up to her demotion.  (Pl. Resp. ¶ 103.)  For example, Kobylski regularly called Mustafaa to the office before she could punch in for the day and question her about previously addressed issues, such as her complaints about the work environment.  (*Id.*; Def. Facts ¶ 103.)  She also claims that one time Kobylski sent her to the office to be furloughed even though she was not eligible.  (Pl. Resp. ¶ 103.)

Finally, Mustafaa lists specific complaints against Castillo, her direct superior.[8]  Mustafaa testified that Castillo assigned her to work on crews to help CSAs rather than perform her Lead

---

[7]Mustafaa admitted that Doran also cursed at other employees, including males and Caucasians, but not in the same discriminatory manner that he degraded her.  (Def. Facts ¶ 77; Pl. Facts ¶ 26.)

[8] Ever since Continental promoted Castillo to supervisor and Mustafaa to Lead, the two did not work well together. Mustafaa complained to Kobylski that Castillo would not allow her to perform her lead duties. (Pl. Facts ¶ 55.)  Castillo's performance evaluations for 2001 indicated overall problems with communication and delegation to Leads.  (Pl. Resp. to Def. Facts ¶¶ 45, 57.)  In May 2001, Castillo and Mustafaa admitted that they had communication problems and agreed to work on improving the situation. (Def. Facts ¶ 45.)

functions at least eight times. (Pl. Facts ¶ 9.) While she admits that "[i]t is common practice for [L]eads to 'work on crews,'" she asserts that Castillo could have selected Reyes, the other Lead under his supervision, rather than exclusively requiring her to perform CSA functions. (Def. Facts ¶ 24; Pl. Resp. ¶ 100.)

Continental filed this motion for summary judgment after the completion of discovery. Mustafaa responded to the motion arguing that a genuine issue of material fact exists as to "whether Continental engaged in unlawful discrimination on the basis of sex and race in demoting Ms. Mustafaa from the position of [L]ead and by subjecting her to a hostile work environment." (Mem. Opp. Summ. J. at 4.)

## II.   **STANDARD OF REVIEW**

Summary judgment is proper only when "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed R. Civ. P. 56(c). A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. This standard places the initial burden on the moving party to identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986) (quotation marks omitted). Once the moving party meets this burden of production, the nonmoving party "may not rest upon the mere allegations or denials of the adverse party's pleading" but rather "must set forth specific facts showing that there is a genuine issue [of material fact] for trial." Fed. R. Civ. P. 56(e). In deciding whether summary judgment is appropriate, we must accept the nonmoving party's evidence as true, and draw all inferences in that party's favor. *See Anderson*, 477 U.S. at 255. Finally, "[w]e apply the summary judgment standard with special scrutiny to employment discrimination cases, which often turn on the issues of intent and credibility." *Michas v. Health Cost Controls of Illinois, Inc.*, 209 F.3d 687, 692 (7th Cir. 2000) (citing *Bellaver v. Quanex*

*Corp.*, 200 F.3d 485, 491 (7th Cir. 2000)).

III.     **ANALYSIS**

   **A. Discrimination on the basis of sex and race: Mustafaa's demotion**

   Mustafaa raises claims of discrimination based on race and sex under both Title VII and Section 1981.  Title VII forbids an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... race or sex."  42 U.S.C. § 2000e-2(a)(1).  Section 1981 makes it unlawful to discriminate on the basis of race in the making and enforcing of contracts.[9] 42 U.S.C. § 1981.  In examining Mustafaa's § 1981 claim, "we employ the same framework that we use with respect to Title VII claims." *Vakharia v. Swedish Covenant Hosp.,* 190 F.3d 799, 806 (7th Cir. 1999); *see also Eiland v. Trinity Hosp.*, 150 F.3d 747, 750 (7th Cir. 1998) (same).

   A plaintiff can establish a Title VII claim either by offering direct proof of discrimination, or by presenting evidence indirectly under the *McDonnell Douglas* burden-shifting analysis.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973); *see also Haywood v. Lucent Techs., Inc*., 323 F.3d 524, 529 (7th Cir. 2003).  Under either method, summary judgment is inappropriate if Mustafaa proffers evidence from which an inference of intentional discrimination can be drawn.  *See Fuka v. Thompson Cons. Electronics*, 82 F.3d 1397, 1402-03 (7th Cir. 1996). Mustafaa argues that a genuine issue of material fact exists whether we address her discrimination claim under the direct approach or under the *McDonnell Douglas* burden shifting scheme, so we will assess the viability of each of her claims under both methods.

   1.     *Application of the direct approach*

   Under the direct method, a plaintiff may show through either direct or circumstantial

---

[9] "For purposes of [Section 1981], the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  42 U.S.C. § 1981. Employment-at-will relationships constitute a contract under § 1981.  *See Stone v. American Federation of Government,* 135 F. Supp. 2d 873 (N.D. Ill. 2001).

evidence that "the employer's decision to take the adverse job action was motivated by an impermissible purpose, such as her race...." *Haywood*, 323 F.3d at 529. Direct evidence of discrimination is evidence that would show a clear acknowledgment of discriminatory intent by the employer. *See, e.g., Davis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 783 (7th Cir.2004) (explaining that direct evidence is an "outright admission by the decisionmaker that the challenged action was undertaken because of the [employee's] race"). Alternatively, Mustafaa may succeed under the direct method by presenting circumstantial evidence which provides a "convincing mosaic of discrimination," *Troupe v. May Department Stores Company*, 20 F.3d 734, 737 (7th Cir. 1994), from which a jury may reasonably infer intentional discrimination. *Volovsek v. Wisconsin Dep't of Agric., Trade & Cons. Prot.*, 344 F.3d 680, 689 (7th Cir.2003). In *Volovsek*, the Seventh Circuit explained that such circumstantial evidence typically includes:

> (1) suspicious timing, ambiguous statements, behavior towards other employees and so on; (2) evidence, but not necessarily rigorous statistical evidence, that similarly situated employees were treated differently; or (3) evidence that the employee was qualified for the [job in question] and passed over and the employer's reason for the difference in treatment is a pretext for discrimination.

*Id.* at 689-90 (citing *Troupe*, 20 F.3d at 736). The three forms of circumstantial evidence can be used independently or in the aggregate to "provide a basis for drawing an inference of intentional discrimination." *Troupe*, 20 F.3d at 736.

Mustafaa does not have direct evidence of a clear acknowledgment of Continental's discriminatory intent to demote her. Rather, she proffers circumstantial evidence, which she argues provides a basis to draw an inference of intentional discrimination based on race and sex. Indeed, circumstantial evidence, if sufficiently persuasive, may defeat a motion for summary judgment. *See Troupe*, 20 F.3d at 736. Mustafaa relies on the first type of evidence described in *Volovsek* to support her racial discrimination claim, but she points to a range of evidence under all three *Volovsek* prongs for her gender discrimination claim.

*a.* Racial discrimination

Mustafaa failed to present sufficient circumstantial evidence upon which a jury could find that Continental demoted her based on her race. She proffers five derogatory statements made by two Leads and one supervisor while she worked at Continental. She personally heard the term "nigger" used twice, even though only one comment was directed at her, and she learned of three other instances where employees uttered racial slurs or discriminatory comments. Disregarding hearsay issues, five comments made predominantly by co-workers without supervisory authority over a number of years, or even one year, do not rise to the level of circumstantial evidence deemed sufficient to withstand a motion for summary judgment contemplated by *Volovsek*.

Even if the five statements could be imputed to Mustafaa's supervisors, Mustafaa fails to present any evidence of a nexus between the discriminatory comments and the decision to demote her. The Seventh Circuit has explained that "bigotry, per se, is not actionable. It is actionable only if it results in injury to a plaintiff; there must be a real link between the bigotry and an adverse employment action." *Gorence v. Eagle Food Ctrs., Inc.,* 242 F.3d 759, 762 (7th Cir. 2001). In order for discriminatory comments to be probative of intent, they also must be causally connected to the decision-making process or contemporaneous with the employment action. *See Marshall v. Am. Hosp. Ass'n,* 157 F.3d 520, 526 (7th Cir.1998); *see also Hong v. Children's Mem'l Hosp.*, 993 F.2d 1257, 1265 (7th Cir. 1992) ("[T]he plaintiff must show that the hospital relied on [] impermissible criterion in making its [employment] decision."). Mustafaa does not submit any evidence that racial animus motivated or even infiltrated Kobylski's decision to demote her. To substantiate her claim of discrimination, Mustafaa fleetingly references her race without providing evidence other than conclusory allegations, which are insufficient to withstand a motion for summary judgment. *See Tyler v. Runyon*, 70 F.3d 458, 465 (7th Cir. 1995). Therefore, the racial discrimination claims under both Title VII and Section 1981 fail under the direct approach.

b. Gender discrimination

Turning to the gender discrimination claim, Mustafaa submits evidence that she believes falls under each *Volovsek* category of circumstantial evidence to show that Continental's decision to

demote her was based on her sex. However, even the cumulative effect of the evidence does not raise a question of fact as to Continental's discriminatory intent.

### i. General circumstantial evidence

The first type of evidence outlined in *Volovsek* "consists of suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." *Troupe*, 20 F.3d at 736. Mustafaa does not provide evidence of suspicious timing as a basis for inferring discrimination since her demotion occurred as a result of Continental's reduction in work force due to an economic crisis in the airline industry. Mustafaa also failed to submit evidence that Kobylski or any supervisors made ambiguous statements regarding her demotion. Rather, Kobylski testified that he demoted Mustafaa because her performance as a Lead compared poorly to her co-workers based on the Supervisors' reviews, which included complaints about organization, punctuality, and interpersonal skills.

Mustafaa points to a number of sexist comments uttered by her co-workers' to support an inference of discrimination. (Pl. Facts ¶¶ 27, 31, 36-38, 43.) However, none of those co-workers were involved in the decision to demote Mustafaa.[10] In *Cerutti,* plaintiffs alleging age discrimination attempted to introduce two supervisors' statements, "out with the old, in with the new," as circumstantial evidence of a Title VII violation. 349 F.3d at 1062. The Seventh Circuit held that it was inappropriate to consider their statements since they were not involved in the termination decisions. *Id*.; *see also Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 397 (7th Cir. 1997) (same). Likewise, Mustafaa cannot use her co-workers' sexist comments to speculate on Kobylski's or the supervisors' discriminatory intent.

Next, Mustafaa points to Derain's discussion with the CSAs in response to her complaints that they did not work well together. According to Mustafaa, Derain told the CSAs, "[t]his is your

---

[10] The one comment Mustafaa attributes to Castillo, "the fucking ramp is [hers,]" is not inherently sexist, nor can we properly infer gender discrimination given the context of the statement. *See Cerutti v. BASF Corp.,* 349 F.3d 1055, 1062 (7th Cir. 2003).

lead agent.  You will treat her like a lead agent.  And guys, understand she's a woman.  Sometimes she might need a little bit of help."  (Mustafaa Dep. at 195.)  Assuming Derain's comment evinces gender discrimination, Mustafaa must show "a causal link between the prejudicial views ... and her [demotion.]"  *Cerutti*, 349 F.3d at 1063.  However, no evidence indicates that Kobylski's decision was tainted by Derain's comment.  First, nothing indicates that Derain made the alleged comment within close temporal proximity to Mustafaa's demotion so as to create an inference of a causal nexus.  *See Bellaver*, 200 F.3d at 493 ( "a long time period between a remark and an employment action can defeat the inference of a causal nexus between the remark and the [employment action].") (quotation omitted).

Second, no evidence indicates that Derain's alleged gender bias influenced the other supervisors' evaluations or Kobylski's ultimate decision.  In *Cerutti*, two individuals who participated in the decion-making process for plaintiffs' terminations allegedly made prejudicial comments about the plaintiffs' age.  349 F.3d at 1063.  However, because they comprised only a portion of the decision-making team, the Seventh Circuit held that their "alleged animus toward older workers is relevant only if there is other evidence from which a reasonable jury could infer that their animus influenced the selection panels' deliberations to such a degree so as to result in the plaintiffs' terminations."  *Id*.  In this case, Derain's involvement with the decision to demote Mustafaa was limited to one conversation with Kobylski in Derain's office where Kobylski asked him to choose the better Lead between Mustafaa and Reyes. (Derain Dep. at 95-96.) Derain selected Reyes without expounding upon his decision or volunteering any commentary.  *Id*.  Kobylski then decided to demote Mustafaa based on his personal knowledge of the Ziegler and Weisinger incidents, Derain's opinion, and four other supervisors' input regarding Leads' performances.  Since no evidence suggests that Derain's alleged animus towards females tainted Kobylski's decision, Mustafaa failed to demonstrate a real link between the discriminatory comment and her demotion.

ii. *Similarly situated employees*

Mustafaa also contends that she has presented the second kind of evidence outlined in

*Volovsek:* "evidence, whether or not rigorously statistical, that similarly situated employees were treated differently." 344 F.3d 680. She claims that Continental overlooked the male Leads' performance and interpersonal skills problems for which she was criticized and ultimately demoted. Specifically, Mustafaa asserts that Continental should have demoted Reyes for one incident of negligent performance, Dixon for attendance problems, and Doran and Aberle for use of profanity, raised voices, and racial slurs. For us to find disparate treatment, Mustafaa must show that Continental treated Reyes, Dixon, Doran, and Aberle differently *and* their disciplinary histories and performances were "directly comparable to her[s] in all material respects." *Ajayi v. Aramark Bus. Serv., Inc.*, 336 F.3d 520, 531-32 (7th Cir. 2003) (quoting *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002)). "In determining whether two employees are similarly situated, a court must look at all relevant factors, the number of which depends on the context of the case."[11] *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000). Mustafaa did not show that her performance record directly or even substantially compared to any of the four male leads.

Management found one area of weakness in each of the four male Leads' performance whereas the supervisors raised concerns about Mustafaa's performance in each category of assessment. For example, Continental observed operational skills deficiencies in both Reyes and Mustafaa. The company disciplined Reyes' for his involvement with a safety violation in January 2001 and Castillo, Bray, and Gorny complained of Mustafaa's mishandling irregular operations and lack of organizational skills. Mustafaa presented no evidence that other male Leads received acceptable reviews for handling irregular operations the way she did. Also, Reyes received no complaints for interpersonal skills, personal conflicts with co-workers, or punctuality. Further, during the eight months between the January incident and the September demotions, it does not appear as though Reyes engaged in any other misconduct or sub-par performance. In contrast,

---

[11] For example, courts look at whether the employees "(i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications." *Brummett v. Sinclair Broad. Group, Inc.*, 414 F.3d 686, 692-93 (7th Cir. 2005).

Mustafaa's supervisors complained about ongoing problems with organization and managing irregular operations. *See Brummett,* 414 F.3d at 693 (finding that employer did not treat plaintiff differently from a co-worker who had the same supervisor, job duties, and monthly sales quotas because that co-worker's overall performance surpassed plaintiff's). Even assuming Reyes' performance directly compared to Mustafa's, there is no evidence that Derain chose Reyes over Mustafaa based on his gender. Rather, the evidence shows that despite Reyes' involvement in a safety violation in January 2001, Derain believed that he transitioned better into Lead due to his work ethic.[12]

Mustafaa's performance also does not directly compare to Dixon's record. During the demotion discussions, Bray raised Dixon's and Mustafaa's attendance problems but he ultimately selected Mustafa as the weakest Lead. Mustafaa admits calling in late to work on a couple of occasions and both parties agree that Dixon's attendance was also an issue. Mustafaa did not submit evidence detailing Dixon's attendance record, so we cannot ascertain whose problems were more egregious. Regardless, Mustafaa presented no evidence that any supervisors complained about Dixon's interpersonal skills or his performance during irregular operations.

Doran's and Aberle's work history also do not directly compare to Mustafaa's because their only infractions involved interpersonal skills whereas complaints about Mustafaa ranged from personal conflicts and organizational difficulties to punctuality. Additionally, complaints regarding Mustafaa's interpersonal skills centered on her involvement in the Ziegler incident and her conflict with Weisinger. Neither Doran, nor Aberle engaged in personal ongoing conflicts with co-workers or a dispute involving misuse of the intercom system.[13]

Nonetheless, Mustafaa raises an additional argument of disparate treatment by claiming that

---

[12] Additionally, Derain's past praise of Mustafaa's ramp operation does not automatically render his decision suspect. Given the fact that Derain's positive commentary occurred in May, four months before the demotion discussions, and did not involve assessments of her abilities vis a vis other Leads, we cannot infer discriminatory intent behind his opinion that Reyes' performance surpassed Mustafa's.

[13] Mustafaa and Derain recall the situation differently, but even Mustafaa admits questioning and/or referencing Ziegler's sexuality over the loud speaker at work during an intense dispute.

the supervisors did not criticize Doran's and Aberle's use of profanity and disrespectful communications whereas her interactions were more carefully scrutinized. Mustafaa claims that complaints about her interpersonal skills reflect her supervisors' displeasure for behavior inconsistent with female stereotypes. Thus, she argues that Continental employed a double standard for men and women Leads. *See Bellaver*, 200 F.3d at 492 ("evaluations may demonstrate discriminatory intent when employees are evaluated on how their interpersonal skills match stereotyped, unequal ideas of how men and women should behave."). In *Bellaver*, the Seventh Circuit found that the only complaint about plaintiff's performance involved interpersonal skills and "the same types of deficiencies seemed to be tolerated in male employees." Unlike *Bellaver*, Mustafaa did not present sufficient evidence to suggest systemic disparities in expectations for male and female Leads at Continental. As a threshold matter, the supervisors' complaints about Mustafaa's interpersonal skills centered on the Ziegler and Weisinger incidents, and Mustafaa presented no evidence that Doran or any other Lead participated in any analogous situations.[14]

Mustafaa points to one occasion where Castillo verbally reprimanded her for speaking harshly to Austin, an insubordinate CSA, despite Continental's acceptance of Lead Doran's use of inappropriate language and modes of communication to co-workers.[15] For Mustafaa to show disparate treatment with regard to disciplinary action, she must demonstrate that Doran was similarly situated regarding conduct, performance, and qualifications. *See Radue*, 219 F.3d at 617. "This normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id*. at 617-18. Mustafaa testified that Doran yelled at another CSA, used profanity towards supervisor Derain,

---

[14] Further, Derain disciplined both Mustafaa and Ziegler for their conduct so Mustafaa cannot argue disparate treatment.

[15] Mustafaa also complains about Aberle's use of profanity and racial slurs, but the evidence she cites is inadmissible hearsay. (Pl. Facts ¶ 40.)

and screamed and cursed at her during work. As to the first allegation, Doran's and Mustafaa's interactions both involved CSAs and aggressive communications. Castillo observed both incidents and counseled Mustafaa and Doran not to treat their subordinates inappropriately. (Castillo Dep. at 93-95.) Therefore, while similarly situated, Castillo did not treat Mustafaa differently than Doran. The second example does not satisfy the similarly situated requirement because Doran used profanity while joking with Derain, thus changing the context of the interaction.[16] (Def. Resp. 109.) Finally, Mustafaa complained to Castillo, Hanselmann, and Gorny that Doran mistreated her. However, the record indicates that those supervisors advised Mustafaa that they would discuss the matter with Doran the same way Castillo discussed communication problems with Mustafaa after she spoke harshly to Darnell Austin. Even if they did not speak with Doran, there is no evidence that management approved of his behavior. Therefore, it does not appear as though Continental disciplined Mustafaa for behavior that was acceptable for male Leads like Doran and, consequently, her reliance on *Bellaver* is misplaced.

Mustafaa completes her argument under this prong of the analysis by claiming that Castillo treated her differently than male Leads because he assigned her to work on crews at least eight times during the year she served as Lead.[17] (Pl. Facts ¶ 9.) No one disputes that supervisors commonly assign Leads to work on crews; however, Mustafaa claims that "she was the only Lead under [Castillo's] supervision that was assigned to work on a crew."[18] (*Id.* at ¶ 10; Def. Facts ¶ 24.) Specifically, Mustafaa contends that Castillo did not assign Reyes to work on crews while he was

---

[16] Also, "[d]ifferent employment decisions, concerning different employees made by different supervisors, are seldom sufficiently comparable to establish a prima facie case ... [because] different supervisors may exercise their discretion differently." *Radue*, 219 F.3d at 618.

[17] Mustafaa presented no evidence that working on crews at least eight times in one year is disproportionate to the number of times other Leads performed the same duties.

[18] Continental cites Castillo's deposition testimony to refute Mustafaa's allegation, but his testimony does not directly contradict Mustafaa's. (Def. Resp. ¶ 10-11.) In fact, according to his testimony, Castillo only specifically recalls assigning Mustafaa to work on crews. (Castillo Dep. at 68-69.) Viewed in the light most favorable to Mustafaa, the evidence either supports her interpretation or presents an issue of fact for the jury.

a Lead.  (Pl. Facts ¶ 11.)  Assuming the truth of Mustafaa's testimony, we cannot say that Castillo's decision suggests gender discrimination because the evidence indicates that, according to Castillo, Mustafaa and Reyes were not similarly situated.  Castillo complained of Mustafaa's inability to handle irregular operations, but he made no similar complaints about Reyes' performance under pressure.  Also, even assuming Reyes and Mustafaa were similarly situated, no evidence indicates that gender discrimination underlie Castillo's decision, given Mustafaa's contentious personal relationship with her supervisor and his alleged difficulty overseeing and delegating tasks to Leads.  While we cannot determine whether Castillo's decision to staff Mustafaa on crews was the result of personal animosity, a power struggle, conflicting managerial styles, or perceived performance problems, the evidence, even viewed in Mustafaa's favor, does not support an inference that Castillo assigned Mustafaa to crews because he harbored gender-based animus.  Analysis of the totality of the evidence reveals that Continental did not treat similarly situated employees differently than Mustafaa.  *See Hong*, 993 F.2d at 1263 ("No technologist retained by the hospital was involved in as many disciplinary actions [or performed as poorly on evaluations] as the plaintiff."); *see also Czerska v. United Airlines, Inc.*, 292 F. Supp. 2d 1102, 1113-14 (N.D. Ill. 2003).

### iii. *Pretext*

The third category of circumstantial evidence outlined in *Volovsek*  is evidence that the reason supplied by the employer for the employment action is a pretext for discrimination. "Pretext exists where the ostensible reason for the employment decision is really a lie contrived to mask unlawful discrimination." *Little v. Illinois Dep't of Revenue*, 369 F.3d 1007, 1012 (7th Cir.2004). In evaluating pretext, we are not to sit as "super personnel departments to second guess an employer's facially legitimate business decisions." *Wells v. Unisource Worldwide, Inc.*, 289 F.3d 1001, 1007 (7th Cir. 2002).  At the same time, we must evaluate whether Continental's reason for demoting Mustafaa had no basis in fact, did not actually motivate, or was insufficient to motivate

her demotion.[19]  *Davis,* 368 F.3d at 784.  Viewing the evidence in the light most favorable to Mustafaa does not lead to a finding of pretext.

First, Mustafaa argues that we should find Continental's decision pretextual because it demoted her in violation of its written policy.  Continental's *Fly to Win Handbook for Agents* lists seniority as the sole criterion for consideration during a reduction in workforce yet Continental demoted Mustafaa based upon her performance rather than seniority.  Assuming that the written policy applies to Leads, and disregarding Hanselmann's testimony that Continental's policy and practice is to demote Leads based on performance, we cannot characterize Continental's decision as pretext for gender discrimination because the company also demoted Santiago, a male Lead with more seniority than some remaining Leads, based on performance.[20]  Therefore, even if Continental disregarded their written policy, they did so indiscriminately for males and females.

Mustafaa also points to Hector Munguia's demotion as evidence that Continental reinstated the seniority system after they eliminated her Lead position.  Munguia worked as a Lead in the international division until October 2001 when Continental got rid of his position.  (Def. Resp. ¶ 112.)  Continental selected Munguia, the employee with the least seniority, after determining that, unlike the domestic division, no Leads in the international department had performance problems.  (*Id.*)  Munguia's demotion does not support an allegation of pretext because Continental used the same process for demoting an international Lead as they did when demoting the domestic Leads in September 2001.  Mustafaa submitted no evidence that any international Lead fell below

[19] The Seventh Circuit recognized that the third type of circumstantial evidence under the direct method is substantially equivalent to the evidence required under the indirect method of *McDonnell Douglas.  See Huff v. UARCO, Inc.*, 122 F.3d 374, 380 (7th Cir.1997).

[20] Mustafaa's motion to strike Amanda Helm's affidavit and portions of Defendant's Response that referred to the affidavit is moot.  We did not consider Helm's attestation that Continental's written policy only applies to "bid" positions like CSAs as opposed to merit-based Leads for two reasons, irrespective of Federal Rule of Civil Procedure 37(c)(1).  First, a plain reading of the written policy reveals that while the preamble defines different job categories, distinguishing CSAs from Leads, the first paragraph in the criteria section, wherein seniority is listed as the critical factor, appears to apply to all Continental employees.  Since we view the facts in Mustafaa's favor for purposes of this motion, we assumed that the policy applied to Leads.  Second, Hanselmann testified at his deposition that the written policy did not apply to Leads, thus Helm's affidavit was largely redundant and immaterial.

expectations to suggest that Continental ignored performance problems in demoting Munguia.

Next, Mustafaa argues that complaints about her performance had no basis in fact or did not actually motivate her demotion. She claims that Kobylski's reliance on the supervisors' subjective, informal performance reviews evinces pretext. Kobylski solicited supervisors' input based on their informal assessments of Leads' performances because Continental did not conduct formal reviews at that time. There is nothing inherently suspect about verbal, contextual reviews by knowledgeable managers. *See Wyninger v. New Venture Gear, Inc.,* 361 F.3d 965, 980 (7th Cir. 2004) ("[E]mployer's lack of corroborating written evidence is not enough by itself to rebut the employer's nondiscriminatory explanation for adverse employment actions"); *Scott v. Parkview Mem'l Hosp.,* 175 F.3d 523, 525 (7th Cir. 1999) (finding that nothing requires employers "to prefer paper-heavy evaluations over contextual assessments by knowledgeable reviewers, or to exalt an assessment of past conduct over a prediction of future performance."). In this case, at least four of the five supervisors that commented on Mustafaa's performance had personal knowledge of her work-related conduct, and nothing indicates that gender discrimination played a role in Kobylski's decision to rely on their feedback. *See Patton v. Indianapolis Pub. Sch. Bd.,* 276 F.3d 334, 339 (7th Cir. 2002) (finding that consultant's recommendation to demote plaintiffs because they were ill-equipped to handle new challenges was not pretextual).

Mustafaa also argues that her supervisors' subjective reviews were tainted by gender discrimination because they knew about her co-workers' sexist behavior, failed to address the problem, and then penalized her for the inability to manage those who degraded her. Ironically, Mustafaa's argument supports Continental's position that it demoted her based on performance: showing that she performed poorly, even if her shortcomings stemmed from co-workers' repugnant behavior, bolsters Continental's assertion that she failed to meet the job expectations rather than inferring that their decision was pretextual. Thus Mustafaa's attempt to establish a causal nexus between her co-workers' behavior and Kobylski's decision to demote her in the guise of pretext is unpersuasive. Indeed, Mustafaa's argument essentially conflates the discrimination and hostile

work environment claims. Whether and to what degree Mustafaa's performance was affected by her co-workers' sexism are valid considerations for a hostile work environment action. *See* Section III(B)(2),(3),(4), *infra*.

Further, we find no merit in Mustafaa's assertions that Kobylski disbelieved Castillo's assessment of her performance or that Castillo's evaluations were marred by gender discrimination. To support her allegations, Mustafaa relies on *Gage v. Metropolitan Water Reclamation Dist. of Greater Chicago*, No. 02 C 9396, 2004 WL 1899902, at *10 (N.D. Ill. Aug. 18, 2004), where we found a question of fact as to how a supervisor's bias impacted the company's decision to terminate plaintiff. In *Gage*, the decision-maker solely relied upon one supervisor for input on plaintiff's performance, but he did not know about that supervisor's racial animus and contentious relationship with plaintiff. *See also Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990) (reversing summary judgment where decision-maker relied on one supervisor's input, that supervisor made discriminatory comments and exaggerated plaintiff's flaws). Unlike *Gage*, the decision-maker in this case, Kobylski, had ample reason to credit Castillo's negative reviews given other supervisors' corroboration and his personal knowledge of misconduct, including the Ziegler incident and Weisinger conflict. Also, Kobylski knew about Castillo's and Mustafaa's contentious relationship and Mustafaa's belief that Castillo treated her differently than other Leads under her supervision. Since the evidence suggests that Kobylski was not blinded by ignorance of a supervisor's ulterior motives, this case is distinguishable from *Gage*. Also, Mustafaa failed to present evidence that Castillo's evaluations were based upon or tainted by sex discrimination. As previously discussed, Mustafaa and Castillo clashed over managerial styles and they had trust and communication issues, but nothing indicates that their problems stemmed from gender-based animus. *See* Section III(A)(1)(b)(ii), *supra*. Similarly, while Castillo found Mustafaa's performance in irregular operations inadequate, no evidence indicates that Castillo approved of other Leads' performance in

22

like circumstances where they conducted themselves in the same manner as Mustafaa.[21]

Finally, Mustafaa puts forth a circular argument to establish pretext: she claims that Continental did not believe that she performed poorly since they did not consider demoting her until September 2001. However, waiting until September to demote her does not mean that she performed better than the other Leads, that her supervisors lied about deficiencies in her performance, or that Kobylski demoted her based on anything other than performance reviews. Further, Mustafaa's self-serving declaration that she performed better than other Leads does not suffice to create a genuine issue as to whether Continental's legitimate nondiscriminatory reason for demoting her had no basis in fact. *Wyninger*, 361 F.3d at 980.

In sum, Kobylski and the supervisors involved in the demotion process believed that they needed to retain the most qualified Leads in anticipation of an increase in workload and stress. Kobylski demoted Mustafaa after the supervisors relayed concerns about her reliability, judgment, and ability to work in irregular operations. No Lead other than Mustafa received as many complaints about overall performance, and nothing supports an inference that Kobylski doubted the supervisors' assessments or that he independently believed that Mustafaa was more capable than another domestic Lead. Further, nothing indicates that Castillo's review was tainted by gender bias, that Kobylski relied upon impermissible factors, or that the purportedly legitimate reason for Mustafaa's demotion was a lie. Despite drawing reasonable inferences in Mustafaa's favor, we find that a combination of all the circumstantial evidence does not raise a genuine issue of material fact as to the possibility that Continental demoted Mustafaa because of her sex under the direct method.

### 2. **Indirect method**

*McDonnell Douglas* sets out a three step analysis to assess unlawful discrimination in the absence of direct proof. 411 U.S. 792. First, the plaintiff must establish a prima facie case of discrimination. *Id.* at 802. If the plaintiff fails to meet his or her initial burden, the defendant is

---

[21] Mustafaa cannot claim that Derain's alleged gender bias tainted his evaluation given his favorable report on her performance in a May 2001 letter to Kobylski and Hanselmann. For a discussion regarding Derain's decision to select Mustafaa over Reyes see Section III(A)(1)(b)(i), *supra*.

entitled to summary judgment. *Oest v. Illinois Dep't of Corrections*, 240 F.3d 605, 612 (7th Cir. 2001). Assuming that the plaintiff satisfies the first step, the burden shifts to the defendant to offer a legitimate nondiscriminatory reason for its action. *McDonnell Douglas*, 411 U.S. at 802. If the defendant succeeds in so doing, the burden shifts back to the plaintiff to present evidence that the reason provided by the defendant is pretextual. *See id.* at 804.

To satisfy the prima facie case requirement, Mustafaa must show that (1) she is a member of a protected class, (2) she performed her job satisfactorily, (3) she suffered an adverse employment action, and (4) Continental treated similarly situated employees outside her class more favorably. *Russell v. Bd. of Trustees of Univ. of Ill. at Chicago,* 243 F.3d 336, 341 (7th Cir. 2001). It is undisputed that Mustafaa can establish two elements: as an African-American female, she is a member of a protected group, and her demotion was an adverse employment action. *See Ajayi*, 336 F.3d at 531 ("[A] demotion is a paradigm adverse employment action"). The second and fourth prongs of the prima facie case are more problematic.

In cases like the one before us, in which the employer claims that it dismissed plaintiff due to inadequate job performance, the second prong is inextricably intertwined with the question of pretext. *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 886 (7th Cir. 2001). Continental asserts that it demoted Mustafaa based on the cumulative effect of poor judgment, punctuality problems, and mishandling of irregular operations. Mustafaa rebuts some of Continental's allegations and submits that she met all performance expectations. We need not decide which party is correct to ascertain whether Mustafaa has established her prima facie case. The *McDonnell Douglas* analysis must be applied flexibly, and in circumstances where the dispute centers on whether the employee was dismissed for failing to meet expectations or for discriminatory reasons, it is acceptable to bypass the second prong and address the issue when we analyze pretext. *See Wyninger,* 361 F.3d at 980 ("Since [the company] relied on [plaintiff's] job performance as its explanation for firing her and because those assessing [her] performance were the same parties accused of discrimination, [plaintiff] does not need to present evidence at the prima facie stage that she was performing her job

satisfactorily."); *see also Curry v. Menard, Inc.,* 270 F.3d 473, 478 (7th Cir. 2001); *Cannon v. Nat'l R.R. Passenger Corp.,* No. 01 C 2571, 2002 WL 15698 (N.D. Ill. Jan. 4, 2002).

We thus move on to the fourth prong, where Mustafaa's case fails. As previously discussed in Section III(A)(1)(b)(ii) *supra*, Mustafaa has not identified any other similarly situated non-black male Leads who were treated more favorably. Therefore, we grant Continental's motion for summary judgment on the discrimination claim relating to the demotion because Mustafaa failed to establish a prima facie case under the indirect method.[22]

### B.      Hostile Work Environment

An employer violates Title VII when it engages in racial or sexual harassment that creates a hostile or offensive working environment. *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 66, 106 S.Ct. 2399 (1986); *Hardin v. S.C. Johnson & Son, Inc.,* 167 F.3d 340, 345 (7th Cir. 1999); *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 673 (7th Cir. 1993). Mustafaa must prove that (1) her work environment was subjectively and objectively offensive, (2) the harassment was based on her membership in a protected class, (3) the conduct was severe or pervasive, and (4) there is a basis for employer liability. *Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1045 (7th Cir. 2002). "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive – is beyond Title VII's purview." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367 (1993). A court must consider the "totality of the circumstances, including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Cerros*, 288 F.3d at 1046 (quoting *Harris*, 510 U.S. at 23). Continental argues that "[Mustafaa] fails to establish a claim for a hostile work environment because she cannot demonstrate that she was subject to unwelcome harassment because of her race or sex nor do her allegations constitute a severe or pervasive hostile

---

[22] Moreover, the evidence does not suggest that Continental's purported reason for demoting Mustafaa – performance – was pretextual. *See* Section III(A)(1)(b)(iii), *supra*.

environment."[23]  (Mot. Summ. J. at 11.)  We agree that Mustafaa did not establish her prima facie case for racial harassment.  However, she presented sufficient evidence to sustain a sexual harassment claim and thus withstand summary judgment.

### 1. *Racial Harassment*

The only evidence that could be construed to support the racial harassment claim consists of two derogatory racial slurs uttered by Continental employees: Pat Moore once described Mustafaa's crew as including a "nigger" and Bill Aberle also said "nigger."[24]  While racial epithets should never be condoned, two statements over the course of several years, or even one year, do not create an objectively offensive environment, nor do they rise to the requisite level of severity.  *See Gage,* 2004 WL 1899902, at *11-12; *compare, e.g., Cerros*, 288 F.3d at 1040 (finding that plaintiff had shown enough to go to trial on a racial harassment claim where employees and supervisors referred to plaintiff as brown boy, spic, wetback, Julio and Javier; racial epithets were painted on bathroom walls referring to Hispanics and plaintiff and touting the KKK; and plaintiff's tires were slashed) *with Williams v. Metro. Water Reclamation Dist. of Greater Chicago,* No. 01-0514, 2002 WL 484860, at *5 (N.D. Ill. Mar. 28, 2002) (finding that isolated race-based discriminatory comment - "it wasn't the Italians that I had a problem with, it was you blacks"- was not actionable because it was neither threatening nor severe and other evidence indicated that the supervisor was harsh, difficult and unfair , but did not suggest he harbored racial animus).  Accordingly, we grant Continental's motion for summary judgment on Mustafaa's racial harassment claim.

### 2. *Objectively offensive harassment based on sex*

In her deposition testimony, Mustafaa recounted fifteen to twenty-two gender biased, disparaging comments made by various co-workers over the course of one year.  *See Section* I(B)(4),

---

[23] The evidence indicates that Mustafaa subjectively believed her environment was hostile.

[24] Mustafaa points to other occasions where Aberle used derogatory language, but we cannot consider that hearsay evidence.  *Eisenstadt*, 113 F.3d at 742.  Even if we disregarded the evidentiary bar, the racial harassment claim would fail because Aberle's remarks were directed at other employees and "the impact of [such] second-hand harassment is obviously not as great as the impact of harassment directed at [Mustafaa]."  *Russell*, 243 F.3d at 343 (citation and quotation marks omitted).

*supra.* In addition to the explicit gender-based discriminatory comments, Mustafaa testified that Pat Doran cursed at her twice a week while she was Lead.[25] For example, Doran would tell Mustafaa to "get [her] ass home, go sit behind that fucking desk, do some paperwork, learn [her] fucking job, [she's] a fucking idiot, [she's] so damn stupid." (Def. Facts ¶ 75.) While Mustafaa acknowledged that Doran also cursed at male employees, she testified at her deposition that he did not call other employees "stupid" or tell them that they "needed to go home and cook for their husbands."[26] (Pl. Resp. ¶ 75.) Based on a totality of the circumstances, a reasonable jury could find that Doran's comments implicitly conveyed gender-based hostility. *But see Wyninger*, 361 F.3d 965 (finding that supervisors were abrasive to and used vulgarities with all employees so plaintiff could not causally connect their crude conduct to her gender).

Mustafaa also presented evidence that Derain, a supervisor, echoed and possibly endorsed the employees' sentiments when he counseled her team on appropriate workplace decorum: "[t]his is your lead agent. You will treat her like a lead agent. And, guys, understand she's a woman. Sometimes she might need a little bit of help."

Mustafaa's testimony paints a picture of hostility from her co-workers due to their beliefs that she was "a woman trying to do a man's job."[27] *See Hardin*, 167 F.3d at 345 ("The complained

---

[25] The other allegations of cursing do not explicitly refer to gender or implicitly evince gender bias when they are viewed in context. (Def. Facts ¶¶ 78, 81.) Thus, Mustafaa cannot establish the necessary causal nexus between the profanity and her gender. *See Wyninger,* 361 F.3d at 976; *Hardin,* 167 F.3d at 346.

[26] Continental's argument that this statement should be stricken is without merit since Mustafaa testified based on her personal knowledge. Moreover, Continental failed to provide any evidence to rebut Mustafaa's testimony that Doran did not curse at male co-workers with gender-based attacks.

[27] In her deposition testimony, Mustafaa described additional acts of alleged sexism, including: Castillo assigned her to work on crews eight times; Doran intentionally sprayed her with de-icing fluid;and management repeatedly summoned her to the office. While she only relied on the sexist comments to oppose summary judgment, we must still assess the legal implications of the supplemental evidence on her sexual harassment claim. *Flynn v. Sandal*, 58 F.3d 283, 288 (7th Cir. 1995). However, none of these incidents bolster her prima facie case since nothing indicates that the alleged misconduct occurred because of her sex. First, as described in Section III(A)(1)(b)(ii), *supra*, Mustafaa did not show that she was treated unfairly relative to male Leads with regard to working on crews and, further, Castillo thought poorly of Mustafaa's performance thus negating an inference of causation between his decision to assign her to a crew - rather than remain a Lead during irregular operations - and her gender. Second, aside from her conclusory allegations, nothing suggests that Doran sprayed Mustafa because of her gender. Finally, Management "summoned" Mustafaa to the office to address her concerns, not to single her out.

of conduct must have either a sexual or racial character or *purpose* to support a Title VII claim.") (emphasis in original); *see also Smith v. Sheahan,* 189 F.3d 529, 533 (7th Cir. 1999) (holding that sex-based animus is sufficient for a Title VII claim). Continental did not produce evidence that its employees made similar gender-based comments to male Leads, nor did they submit proof that the sexist comments could be attributed to frustration with Mustafaa's performance irrespective of her gender. *See Hicks,* 2004 WL 3119016, at *4, 12 (finding an issue of fact where a male plaintiff showed that employee continuously made sexually explicit comments and gestures towards him but not to any female employees and where the evidence suggested the cause of the employee's behavior was either a work-related dispute or gender bias); *but cf. Spearman v. Ford Motor Co.,* 231 F.3d 1080, 1085 (7th Cir. 2000) (sexually explicit remarks made as a result of acrimony over work-related disputes do not constitute sexual harassment). Thus, viewed in the light most favorable to Mustafaa, Continental employees singled her out because of her gender. Despite Continental employees' repugnant behavior, we must still determine if the sexual stereotyping was objectively offensive, i.e. sufficiently severe or pervasive, because "not every unpleasant workplace is a hostile environment." *Wyninger*, 361 F.3d at 977.

### 3. *Severe and pervasive sexual harassment*

Whether the complained of conduct reaches the requisite level of severity depends upon where the sexist statements fall on the line between sexual harassment and mere vulgar banter. The Seventh Circuit outlined a continuum of inappropriate behavior:

> On one side lie sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; pornographic pictures. On the other side lies the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers.

*Worth v. Tyer*, 276 F.3d 249, 267 (7th Cir. 2001). To place this case on the continuum, we must assess the context of the sexist remarks, the gravity of the discriminatory behavior, and the effect it had on the conditions of Mustafaa's employment. *Pennsylvania State Police v. Sudders,* 542 U.S. 129, –, 124 S. Ct. 2342, 2347 (2004)*; Oncale v. Sundower Offshore Serv., Inc.,* 523 U.S. 75, 81, 118

S.Ct. 998, 1003 (1998); *Meritor*, 477 U.S. at 67.

Mindful of the need for sensitivity to social context, we believe that a fact finder could reasonably decide that Continental employees' gender-based animus exceeded the bounds of acceptable workplace banter. *See Oncale,* 523 U.S. at 81; *accord Smith*, 189 F.3d at 535. First, viewed in the light most favorable to Mustafaa, the evidence shows that she was subjected to a stream of sexist remarks criticizing her performance and questioning her suitability as a Lead due to her gender. Moreover, the gender-based hostility rose to a dangerous level during an argument with Ziegler where he ran up to her in a forceful manner and got in her face screaming "I'm not listening to this slut ... I hate this bitch."[28] (Mustafaa Dep. at 125-28.)

Second, the gender discrimination was not occasional, infrequent or isolated as a matter of law. Mustafaa testified at her deposition that she endured gender-biased comments regularly, and she specifically recalled between fifteen to twenty-two instances of explicit gender based incidents during the course of one year. In *Hicks*, the court found that the plaintiff satisfied the "pervasive" portion of the analysis by presenting evidence of twenty-nine to thirty sexually explicit comments during a year and a half to two years. 2004 WL 3119016, at *13; *but see Haywood v. Evergreen Motor Cars, Inc.,* No. 02 C 6408, 2003 WL 21418248 (N.D. Ill. Jun. 18, 2003) (finding five to six discriminatory comments and one email over four years insufficient to satisfy the "objectively offensive" requirement). However, the court in *Baskerville v. Mulligan International Company* found that nine comments over a seven month period did not constitute an objectively offensive environment given (1) the nature of the alleged discrimination - the employee did not say anything that could not be repeated on prime time television, and (2) the context of the statements – the

---

[28] Neither party addressed whether Ziegler's behavior was attributable to a work-related dispute, a mere personality clash, or gender-based animus. While expletives like "slut" and "bitch" refer to females, their modern-day usage does not automatically equate to disparaging someone because of their sex. Also, Ziegler's reference to Mustafaa being "sexually touchy-feely"and "talking sex with male ramp employees" could either indicate displeasure that she was not one of the boys or a complaint about inappropriate behavior. Nonetheless, a jury could find that Ziegler verbally assaulted and threatened Mustafaa because of her sex after assessing the context of their dispute and making credibility determinations. *See Wrick v. City of Chicago*, No. 99 C 4777, 2003 WL 21823544, at *7 (N.D. Ill. Aug. 6 2003).

employee never touched the plaintiff, threatened to harm her, or even invited her to go on a date. 50 F.3d 428, 430-32 (7th Cir. 1995). Unlike *Baskerville*, the bulk of the remarks in this case are unambiguously and offensively sexist, the employees' insubordination could be construed as an extension of their gender-based animus, and it is not "difficult to imagine a context that would render [the employees' conduct] threatening or otherwise deeply disturbing" considering the Ziegler incident. *Id.* at 431.

Finally, a jury could find that the sexual harassment "alter[ed] the conditions of [Mustafaa's] employment and create[d] an abusive working environment." *Meritor*, 477 U.S. at 67; *see also Oncale*, 523 U.S. at 80 ("The critical issue ... is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed."). For example, Mustafaa regularly faced discriminatory ridicule and insults at work, which made her uncomfortable and distressed. *Meritor*, 477 U.S. at 65 ("Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult."). Also, the sexual harassment detracted from her ability to successfully perform as a Lead: her job required overseeing and delegating responsibilities to the same employees that exhibited contempt for females' involvement with ramp operations and service in authoritative positions.[29] *See Howley v. Town of Stratford*, 217 F.3d 141, 154-56 (2d Cir. 2000) (considering the impact on plaintiff's respect and impairment of her ability to lead in a hostile work environment claim). Viewing the evidence in the light most favorable to Mustafaa, a factual dispute exists as to whether her co-workers' conduct rose to the level of severity proscribed by the statute based on the cumulative effect of the nature of the sexist comments, the frequency with which Mustafaa had to endure the harassment, and the degree to which the discriminatory attitudes interfered with her ability to perform as a Lead. *See Hicks,* 2004 WL 3119016, at *13; *but see Spencer v. Office of Illinois Attorney Gen.,* No. 01 C 7811, 2002 WL 31898190, at *7 (N.D. Ill. Dec. 31, 2002) (holding

---

[29] While Mustafaa's inability to gain her crew's respect could be attributed to sources other than gender bias, a jury could find that their insubordination stemmed from her sex. Moreover, Continental did not show that male Leads experienced similar, ongoing, and persistent difficulties with crews.

that three brief comments about plaintiff's body and attire over a period of a year without any allegation that the inappropriate conduct interfered with her work did not constitute severe or pervasive harassment).

### 4. *Basis for employer liability for sexual harassment*

Having established a genuine issue of fact as to the first three elements of her prima facie case, Mustafaa must overcome one more hurdle to defeat the motion for summary judgment: she needs to show why Continental should be liable for her co-workers' harassment.[30] "[E]mployers are liable for a co-employee's harassment only when they have been negligent either in discovering or remedying the harassment." *Parkins v. Civil Constructors of Illinois,* 163 F.3d 1027, 1035 (7th 1998) (quotation omitted). However, "[a]n employer's legal duty in co-employee harassment cases will be discharged if it takes reasonable steps to discover and rectify acts of sexual harassment by its employees." *Id.*; *Hicks*, 2004 WL 3119016, at *15 (same). In this case, Continental took reasonable steps to discover and prevent sexual harassment, but a question of fact exists as to whether they were negligent in remedying Mustafaa's situation.

First, Continental provides multiple avenues for their employees to report harassment:

> If the harassment continues...contact your supervisor or manager ... [I]f you fail to solve your problem by talking with your supervisor/manager, take your complaint to the next level of supervision, or another manager. If the problem is still unresolved or if you fear retaliation, contact the Human Resources Manager ... or [headquarters]."

(Pl. Resp. ¶ 11.) Mustafaa, along with all Continental employees, received a copy of the company's anti-harassment policy at the outset of her employment. She participated in anti-harassment training on an annual basis, and Continental posted the anti-harassment policy and complaint procedure throughout O'Hare. (Def. Facts ¶¶ 7, 15, 17.)

Second, "notice or knowledge of the harassment is a prerequisite for liability."[31] *Parkins,*

---

[30] Mustafaa limited her claim to co-worker harassment thus precluding the need to assess vicarious liability under the strict liability theory espoused in *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275 (1998), and *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257 (1998).

[31] It is not our job to scour the record searching for evidence to bolster Mustafaa's position, which means that "supporting documents submitted with a motion that are not referred to in the statement of facts will be ignored." *See Malec,* 191 F.R.D. at 583. Further, only those complaints referring to or inferring

31

163 F.3d at 1035. In her brief opposing summary judgment, Mustafaa cited seventeen paragraphs in her Rule 56.1(b)(3) statement to show that Continental knew about her co-workers' misconduct. Construing the facts liberally in her favor, she complained about Doran's screaming and cursing to Castillo and Hanselmann three times, and Kobylski and Gorny at least once. (Pl. Facts ¶¶ 63-66). She also raised Ziegler's demeaning behavior and CSAs' cursing during a meeting with management on May 21, 2001. (Pl. Facts ¶ 60.) At that meeting, Mustafaa complained "that people wouldn't listen to her, [that they would] give her a hard time as far as working together. If she gave some direction, it wouldn't always be followed." (Hanselmann Dep. at 61.) She also complained to Derain, Castillo, and Kobylski that the CSAs would not follow her directions. Derain documented Mustafaa's concerns in a letter to Kobylski and Hanselmann wherein he notes that Mustafaa believed her difficulties stemmed from hostility due to her race or gender. (Derain Dep. at 88-90.)

Also, Continental referenced an occasion where Mustafaa reported sexist comments to Castillo after she first started working as a Lead. (Def. Facts ¶ 107.) It is undisputed that Castillo then spoke to the CSAs and informed them that their behavior was unwarranted and inappropriate. (Mustafaa Dep. at 206.) When the harassment continued, Mustafaa reported their misconduct to Derain. (Def. Facts ¶¶ 108-109.) Derain met with her crew to address the issue and said, "[t]his is your lead agent. You will treat her like a lead agent. And, guys, understand she's a woman. Sometimes she might need a little bit of help." (Mustafaa Dep. at 195.) Mustafaa told Derain that she found his remarks inappropriate so he apologized. (Def. Facts ¶ 110.) After Derain's meeting, Mustafaa continued to experience harassment from her co-workers and she continued to report their misconduct. She also reported Derain's statement to Kobylski and Hanselmann when they met in May 2001 to discuss her complaints. (Mustafaa Dep. at 196.)

Since Continental was aware of at least some of Mustafaa's complaints of harassment, we must assess whether they were negligent in remedying the problems. The law requires Continental

---

sexual harassment are relevant for this analysis.

to take reasonable steps, even if not necessarily effective, to prevent future misconduct. *Baskerville*, 50 F.3d at 433; *Parkins*, 163 F.3d at 1036. However, "a remedial measure that makes the victim of sexual harassment worse off is ineffective per se." *Hosteller v. Quality Dining, Inc*., 218 F.3d 798, 811 (7th Cir. 2000). We cannot say as a matter of law that Continental dodges liability here, because despite evidence that Continental took steps to address the gender discrimination, it is disputed whether their actions were timely, sufficient, or reasonably calculated to prevent future harassment.

As a threshold matter, it is undisputed that Continental effectively disseminated its' anti-harassment policy and provided recurrent anti-harassment training. Such pro-active initiatives satisfy the purpose of Title VII and weigh in favor of finding that the company took reasonable steps to address sexual harassment. *See Parkins*, 163 F.3d at 1037. Also, the evidence indicates that Mustafaa did not always take advantage of all avenues of recourse, despite knowledge of the company's policies and her dissatisfaction with the response to her complaints. However, she did raise the misconduct with multiple supervisors, a manager, and O'Hare's general manager. Therefore, we cannot say as a matter of law that Mustafaa unreasonably failed to mitigate her damages, a pre-requisite for establishing employer liability. *See Sudders,* 124 S. Ct. at 2354, 2357; *see also Parkins*, 163 F.3d at 1036-1038 (finding plaintiff unreasonably failed to reduce her harm where she only brought harassment complaints to two co-workers who had no supervisory or managerial authority despite the prevalence of supervisors and the existence of established grievance procedures). Moreover, neither the existence of anti-harassment policies, nor Mustafaa's failure to exhaust her remedies under those policies is determinative. *Meritor*, 477 U.S. at 72 ("we reject ... that the mere existence of a grievance procedure and a policy against discrimination, coupled with respondent's failure to invoke that procedure, must insulate petitioner from liability.").

Mustafa argues that her supervisors failed to relay her concerns to higher management, Continental neglected to conduct any investigation into her complaints, and it never addressed her co-workers' gender-biased attitudes. For example, in response to complaints that Doran cursed and

talked down to Mustafa, Castillo said, "[w]ell, you know, that's just how Pat is. You know, the two of you just have to learn how to work together." (Pl. Resp. ¶ 40.) Gorny told her not to worry about Doran and that he would talk to Hanselmann; Hanselmann told Mustafaa that he would take care of Doran. However, Continental submitted no evidence that Gorny spoke with Hanselmann or that either individual followed-up on Mustafaa's complaints, investigated Doran's misconduct, or counseled him about his behavior. (Mustafaa Dep. at 164-167.)

Continental provided evidence that they took some action at the May 2001 meeting where Hanselmann, Kobylski, Castillo, and Derain got together with Mustafa to discuss her concerns. First, "the managers informed Mustafaa that she should bring up concerns with management as soon as they arise, so that her supervisors could support her and ensure that CSAs followed her directions." (Def. Facts ¶ 44.) They also issued a written directive to all CSA agents to follow their Leads' orders and instructed all of the supervisors to meet with CSAs to verbally reinforce the directive. While Continental's response did not explicitly address the underlying gender discrimination, a jury could find that their actions were reasonable to prevent future harassment, especially since it is unclear what role gender discrimination played at the meeting.[32] Although, a jury could also consider Continental's failure to implement common-sense remedial measures, such as reminding the CSAs of the anti-harassment policy, providing Mustafaa the option to work with a different crew, directly confronting the harasses or requesting that they apologize for their misconduct, since Mustafaa "presented some evidence suggesting that the steps her employer took were not reasonably likely to prevent the harassment from recurring[.]" *See Williams v. Waste Mgmt. of Illinois,* 361 F.3d 1021, 1031 (7th Cir. 2004); *see also Wyninger* 361 F.3d at 978 (discounting the company's failure to "remind[] its employees of the ... sexual harassment policy, offer[ plaintiff] an alternative to dealing directly with the [harasser], and order[] the men to offer an apology" because the employer acted reasonably to prevent, and actually did prevent, future harassment.)

---

[32] According to Mustafaa, she relayed examples of harassment, but they were dismissed as old news. For its part, Continental claims that Mustafa failed to provide specifics of her complaints, which could factor into a reasonableness analysis regarding their response.

Further, the evidence is somewhat ambiguous as to what, if anything, occurred subsequent to the May 2001 meeting after it became clear that management's directives failed to curb Mustafaa's harassers. Management apparently met with Mustafaa to discuss the continuing problem, but nothing suggests that Continental took steps to investigate her claims or confront the perpetrators, and she continued to work with the same crew. Also, Mustafaa's gender discrimination complaints pre-dated May 2001 and there is evidence that Continental's early response could have made her situation worse. Most importantly, when Derain met with Mustafaa's crew to discuss her concerns, he said she was a woman so "she may need a little extra help." (Def. Facts ¶ 109.) A jury could find that such remarks not only failed to rectify harassment or gender-based animus, but encouraged and reinforced the discrimination. Thus, we cannot say that Continental acted reasonably to prevent future harassment as a matter of law based on the undisputed evidence. *See Wyninger*, 361 F.3d at 978 (finding that defendant acted reasonably when it conducted a prompt, thorough investigation into claims of discrimination, tapped the victim's phone to identify the culprit in future harassing calls, and where the harassment stopped after the victim reported the misconduct); *see also Parkins*, 163 F.3d at 1036 (holding that employer acted reasonably where it conducted immediate investigation into complaints, promptly punished and threatened to terminate the harassers, and the harassment ceased after the company took action); *Baskerville*, 50 F.3d at 432 (finding that once plaintiff complained to appropriate department, the company promptly investigated the claims of harassment, confronted the harasser and instructed him to discontinue his behavior, delayed awarding him a salary increase, and successfully prevented future harassment); *Saxton v. American Telephone & Telegraph Co.*, 10 F.3d 526, 535 (7th Cir. 1993) (finding that conducting an investigation the day after the plaintiff reported sexual harassment, completing the detailed report in two weeks, and transferring the harasser out of plaintiff's department was "both timely and reasonably likely to prevent the conduct underlying her complaint from recurring.").

**IV. CONCLUSION**

      For the reasons set forth above, we hereby grant Continental's motion for summary judgment on Mustafaa's Title VII and Section 1981 discrimination claims and the hostile work environment claim based on race.  However, we deny Continental's motion for summary judgment with respect to the hostile work environment claim based on sex.


                                          _____

                                          Honorable Marvin E. Aspen

                                          U.S. District Court Judge


Dated: January 3, 2006